# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| CLAUDIA GONZALEZ | § | |
| | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. B-03-125 |
| | § | |
| | § | |
| STAPLES THE OFFICE SUPERSTORE | § | |
| d/b/a STAPLES THE OFFICE SUPERSTORE | § | |

## PLAINTIFFS CLAUDIA GONZALEZ' SUPPLEMENTAL DISCLOSURES

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, CLAUDIA GONZALEZ, Plaintiff in the above numbered and styled cause of action, and makes these disclosures in accordance with Rule 26 (a)(1) of the Federal Rules of Civil Procedure.  Plaintiff Claudia Gonzalez makes the following disclosures subject to and without waiving its right to protect from disclosure (a) any and all communications protected from disclosure by the attorney-client privilege, (b)  any and all work-product conclusions, opinions, or legal theories of the Plaintiff's attorneys or other representative concerning this litigation, and (c) any and all confidential information until a suitable protective order is entered to protect the confidentiality of such information available to it at the time disclosure was required by the Federal Rules of Civil Procedure.  Plaintiff's investigation in continuing and incomplete.

**Rule 26 (a)(1)(A)**     The name, and if known, the address and telephone number of each individual likely to have discoverable information relevant to disputed facts alleged with particularity in the pleading, identifying the subjects of the information.

**Responses**

Claudia Gonzalez
1618 Harvard Avenue
Brownsville, Texas 78520
(956) 982-1078
Plaintiff's health care provider

Bliss Clark, M.D.
Rio Grande Orthopedic Center
And their Custodian of Records
1601 Treasure Hills Boulevard
Harlingen, Texas 78550
Plaintiff's health care provider

Michael Melton, D.C.
Brownsville Chiropractic Clinic
And their Custodian of Records
55 West Elizabeth
Brownsville, Texas 78520
(956)548-1980
Plaintiff's health care provider

Dr. Madhaven Pisharodi
And their Custodian of Records
942 Wildrose Lane
Brownsville, Texas 78520
(956) 541-6725
Plaintiff's health care provider

Brownsville Open MRI
And their Custodian of Records
908 Paredes Line Road
Brownsville, Texas 78520
(956) 541-4488
Plaintiff's health care provider

United Door Service
Concourse Building
1 Copley Parway, Suite 212
Morrisville, NC 27560
Company performed maintenance on the door in questioned in this lawsuit.

Rick Balli (Manager)
Staples the Office Superstore
2436 Pablo Kisel
Brownsville, Texas 78521
(956)541-1500

Lou Garcia
Staples Assistant Store Manager

Dr. Alejandro Bettancourt
Treated and examined Claudia Gonzalez as a result of the injuries sustained as a result of
the accident, subject of this suit.

**Rule 26 (a)(2)(A)**    In addition to the disclosures required to paragraph (1) a party shall
disclose to other parties the identity of any other person who may be used at trial to present
evidence under Rules 702, 703, or 705 of the Federal Rule of Evidence.

**Response**

Dr. Alejandro Bettancourt, M.D.
Valley Spine Neurosurgeons
(956) 425-3706
Report attached hereto as Exhibit "A".

Dr. Bliss Clark, M.D.
Clark Orthopedics
(956)425-9425
Report attached hereto as Exhibit "A".

Warren F. Davis
43 Holden Road
Newton, MA 02465-1909
(617) 244-1450
Door Expert; Report attached hereto as Exhibit "A".

**Rule 26 (a)(2)(B)**    Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involved in giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study of the testimony; and a listing of any other cases in which the witness has testified as an expert at trail or by deposition within the preceding four years.

**Response**

Plaintiff has attached hereto the experts reports as Exhibit "A".


RESPECTFULLY SUBMITTED,

**R.W. ARMSTRONG & ASSOCIATES**
2600 Old Alice Road, Suite A
Brownsville, Texas 78521
Telephone:    (956) 546-5556
Facsimile:    (956) 546-0470
BY:    _____
            R.W. Armstrong

## CERTIFICATE OF SERVICE

I hereby certify that **Plaintiff Claudia Gonzalez' Initial Disclosures** were on this the 1st day of June, 2004, served via hand delivery to:

Hon. Sarah A. Nicolas
**Rodriguez, Colvin, & Chaney L.L.P.**
1201 East Van Buren
Brownsville, Texas 78520

R. W. Armstrong

# EXHIBIT "A"

# Alejandro J. Betancourt, M.D.

*2876 Fleet Street*
*Brownsville, TX 78521*
*Phone (956) 504-0092*
*(956) 425-3706*

**Objective:** Seeking privileges at Harlingen Medical Center to allow me to develop as a neurosurgeon in the community of Harlingen.

**Training:**
* University of Puerto Rico, Medical Science Campus
  *Chief Resident, Neurological Surgery*
* University of Puerto Rico, Medical Science Campus
  *Second Year Surgery Residency*
* University of Puerto Rico, Medical Science Campus
  *Internship, Straight Surgical Intern*

**First-Aid Skills:**
* University of Puerto Rico, School of Medicine - *ATLS*
* Hospital La Concepcion - *ACLS*

## Experience and Privileges:

05/94 - 08/00
* Emergency Medicine (ASEM), Puerto Rico Medical Center
  *Surgical Screener*

08/01 - Present
* Brownsville Medical Center, Brownsville, TX
  *Neurological Surgeon - Active Staff*

* Valley Regional Medical Center, Brownsville, TX
  *Neurological Surgeon - Active Staff*

* Valley Baptist Medical Center, Harlingen, TX
  *Neurological Surgeon - Active Staff*

* Brownsville Surgical Hospital, Brownsville, TX
  *Neurological Surgeon - Active Staff*

**Registration:**
* Texas Medical License
* Puerto Rico Medical Permanent State License
  *Diplomat National Board of Medical Examiners*
* American Board of Neurological Surgery
  *Primary Examination (563)*

*Page Two*
*Alejandro J. Betancourt, M.D.*

* Midas Rex Certification Course
* Vertebroplastics Certification Course
* Percutaneous Pedicle Screw Instrumentation Software Davek Certification

## Education:

*08/92 - 08/97*   * Ponce School of Medicine, Ponce, Puerto Rico
    *M.D. (Standing: Fifth position in my class) GPA: 82:27*

*08/82 - 08/87*   * University of Puerto Rico, Rio Piedras, Puerto Rico
    *B.S. Major: Biology (Cum Laude Graduate) GPA: 3.45*

*08/79 - 05/82*   * Santa Cruz High School, Trujillo Alto, Puerto Rico
    *High Honors Awards GPA: 3.90*

## Research and Publications:

* *Underdosing of Ibuprofen in Patients with Dysmenorrhea* - Family Medicine Department

* *Underdosing of Acetaminophen in Pediatric Patients with Fever* - FMD

* *Public Health Research in Small Community in Torrecillas, Morovis, PR* - FMD

* *Recurrence of Prostate Adenocarcinoma after Radical Prostatectomy* - Urology Department, University of Puerto Rico - Journal of Urology

* *Recurrent Carotid Artery Stenosis for Hispanic Veteran and Non-Veteran Population Review of Eight Years Experience* - Brau, Ricardo H., M.D.; Betancourt, Alejandro J., M.D.; Brau, Ricardo Jr.; Coldberg, Ricardo (Submitted)

* *Repair of Long Distance Peripheral Nerve Gaps* - Betancourt, Alejandro and Kuffler, Damien, Division of Neurosurgery and School of Medicine, Medical Science Campus, University of Puerto Rico, San Juan, PR. 00901. Poster Presentation in the Seventy Puerto Rico Neuroscience Conference, December 5, 1998.

* *Enhancing the Rate of Neurite Outgrowth in the Peripheral Nervous System* - Betancourt, Alejandro; Reyes, Onix; Kuffler, Damien. Poster Presentation in the Congress of Neurological Surgeons 49th Annual Meeting, Boston, Massachusetts, October 30-November 4, 1999.

*Page Three*
*Alejandro J. Betancourt, M.D.*

* *The Mortality of Liver Failure After Kidney Transplantation, TX Proceedings* - E.A.. Santiago Delpin, Z.A. Gonzalez, L.A. Morales Otero, N.E. Cruz, C. Santos, A. Betancourt, E. Zayas.

* *Isolation and Long-Term Survival of Human Sensory Neurons in Vitro.* Neurodegenerative Disorders: Common Molecular Mechanism - Sosa, I.; Reyes, O.; Betancourt, Alejandro; Kuffler, Damien. Jamaica, February 1997.

* *Improvement in Methods for Dissociation and Long-Term Survival of Isolated Adult Human Sensory Neurons in Vitro* - Sosa, I.; Reyes, O.; Betancourt, Alejandro; Inserni, J.; Küffler, Damien. Annual Meeting American Association of Neurosurgeons, San Juan, Puerto Rico, February 1997 and First International Latin American Spinal Cord Society Meeting, SIALC, Fajardo, Puerto Rico, June 1997.

## Professional Organizations:

* American Medical Student Association

* Puerto Rico Heart Association (Affiliate of the American Heart Association)

* Puerto Rico Medical Association (Student Member)

## Languages:

* Spanish (Fluent written and spoken)

* English (Fluent written and spoken)

## Extracurricular Activities:

* Open water diver, PADI certified.

* Advanced lifesaving and water safety course certified by the American Red Cross

* Member of AAA Gun Club, licensed shooter

* Certified course of boating skills and seaman by the U.S. Coast Guard Auxiliary. Part of my expertise working with small boats in the Department of Natural Resources

* Counselor of Third Year Student, physical diagnosis and history taking.

Page Four
Alejandro J. Betancourt, M.D.

* Hypertension Screening, Expocamara 1992, Ponce School of Medicine Exposition

* Tamarindo Outpatient Pediatric Clinics for medically indigent patients.

* Corp. of Auxiliary Scientific Investigators, Department of Natural Resource, Research and Protection of Wildlife and National Parks.

## Personal:

* Married, U.S. Citizen, Excellent Health

**Excellent References Furnished Upon Request**

Bliss W Clark, M.D., F.A.A.O.S
Diplomate
American Board of Orthopedic Surgery

**Clark Orthopedics**
**& Rehabilitation**

5505 S. Expressway 77/83, Suite 303
Harlingen, Texas 78550
Telephone (956) 425-9425
Facsimile (956) 425-7339
www.clarkortho.com

To Whom It May Concern                                      5/22/04

Ms. Claudia Gonzalez is a long standing patient of mine who I have followed and treated for a long
time. She was struck in the right shoulder by a large heavy door and subsequent to that injury had
persistent right shoulder pain which was diagnosed objectively with an MRI scan of the shoulder as a
post-traumatic tendonitis [ICD-9 codes: 726.19 & 716.16]. She related no history of ® shoulder pain or
symptoms prior to the aforementioned injury. She eventually required surgical treatment of her
unresolving condition and on 01/23/04 underwent an arthroscopic surgical procedure on her right
shoulder that was performed by me. She is currently in therapy and is recovering slowly.

In my opinion, in all medical probability, the proximate cause of her shoulder condition as outlined
above is the injury from the heavy door. All subsequent treatment for her shoulder injury provided to
her by me and others was/is necessary as a result of this door injury.

Very Sincerely,

Bliss W. Clark M.D.

# Preliminary Report of Plaintiff's Expert

May 26, 2004

*by*

Warren F. Davis, Ph.D.

DAVIS ASSOCIATES, INC.
43 Holden Road
Newton, MA 02465-1909

Tel. 617-244-1450 - FAX 617-964-4917

*for*

Ron Armstrong
R. W. Armstrong & Associates
2600 Old Alice Road, Suite A
Brownsville, TX 78521-1456

*in*

Claudia Gonzalez *vs.* Staples *vs.* United Door Service
Civil Action No. B-03-125

# CONTENTS

QUALIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

EVIDENCE CONSIDERED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DESCRIPTION OF THE ACCIDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

DOOR EQUIPMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

INTENDED DOOR OPERATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

CAUSE OF THE ACCIDENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Primary cause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
            Hold open beams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
            Microwave motion sensors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            Hold open time delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    B.    Additional contributory causes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
            Failure to provide adequate warnings on the subject door . . . . . . 6
            Failure to perform *Daily Safety Check* . . . . . . . . . . . . . . . . . . . . . . . 6
            Failure to upgrade to newer, more reliable sensors . . . . . . . . . . . . 7
                Presence sensors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
            Failure to utilize older, more reliable technology . . . . . . . . . . . . . . 7
            Failure to institute preventative maintenance . . . . . . . . . . . . . . . . . 8
            Improper maintenance of the subject door . . . . . . . . . . . . . . . . . . . 8

    C.    Violations of ANSI Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            Violations of 1991 and 1999 ANSI A156.10 national standards . . . . 9
            Violations of ANSI Z535.4-1991 national standard . . . . . . . . . . . . . 9

CONCLUSION/OPINIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## QUALIFICATIONS

I hold a Ph.D. degree (1979) in theoretical physics from the Massachusetts Institute of Technology (MIT), and an undergraduate degree (S.B., 1970) in physics likewise from MIT. I also have relevant experience, both formally and practically, in computer science, electrical engineering, and microwave and infrared (IR) technology, which includes radar signature analysis for the U.S. Pacific Test Range as both a consultant and subcontractor to the MIT Lincoln Laboratory, several years in the U.S. space program (Apollo project) and cumulatively about ten years in the U.S. defense industry (Polaris, Poseidon and Minuteman missile systems and other defense applications).

I am now, or have been, retained as a technical expert and/or expert witness in more than one hundred thirty automatic pedestrian door cases across the United States. I have specific, detailed technical knowledge of the theory, design and operation of the various sensors used with such doors, the physical laws underlying the operation of such doors and sensors, and am familiar with the applicable national standards, notably, ANSI (American National Standards Institute) A156.10, ANSI A156.19, ANSI Z535.4, UL (Underwriters Laboratory) 325, as well as the British standard BS 7036. I hold two U.S. patents for sensing devices for use with automatic pedestrian doors (U.S. Patents 5,481,266 and 6,281,803).

## PRELIMINARY REPORT

This is a preliminary report the purpose of which is to disclose my opinion at this time as to how the accident involving Plaintiff Claudia Gonzalez occurred on Saturday, September 1, 2001, taking into account the performance characteristics of the subject door and its sensors, the governing laws of physics and the information available to me at this time.

The opinions expressed in this report are preliminary and are conditioned upon the evidence and information cited below. They are subject to modification or change if, and as, warranted by any new evidence or information that may yet be produced in this case and by any current evidence that has not yet been brought to my attention and I have, therefore, not yet reviewed.

## EVIDENCE CONSIDERED

The conclusions and opinions expressed in this report are based upon my examination of the following information and documents:

1. Description of the accident, including description of surveillance videotape, provided to me by Plaintiff's counsel in a letter dated May 24, 2004.

2. Set of fifty-nine (59) digital (JPG format) color photographs taken by counsel for Claudia Gonzalez on, or about, Friday, May 21, 2004.

3. Telephonic answers to supplemental questions about the accident and the subject door posed by me and provided by Plaintiff's counsel on May 26, 2004.

4. *American National Standard for power operated pedestrian doors*, A156.10-1999, dated April 26, 1999, American National Standards Institute, Inc., 1430 Broadway, New York, NY 10018.

5. *American National Standard for power operated pedestrian doors*, A156.10-1991, dated September 10, 1991, American National Standards Institute, Inc., 1430 Broadway, New York, NY 10018.

6. *Product Safety Signs and Labels*, Z535.4-1991, American National Standards Institute, Inc., 1430 Broadway, New York, NY 10018.

7. U. S. Patent 4,467,251 titled *Object Sensing Apparatus*, August 21, 1984, assigned to Besam AB, Landskrona, Sweden.

8. U. S. Patent 4,560,912 titled *Object Sensing Apparatus for an Automotive Door*, December 24, 1985, assigned to Bert O. Jönsson, Sweden. This patent is a continuation of U. S. Patent 4,467,251.

9. U. S. Patent 4,590,410 titled *Object Sensing Apparatus*, May 20, 1986. The inventor of record is Bert O. Jönsson, Vintrie, Sweden. There is no assignee published on this patent.

10. U. S. Patent 4,888,532 titled *Object Sensing Apparatus*, December 19, 1989, assigned to Besam AB, Landskrona, Sweden.

11. U. S. Patent 5,276,391 titled *Door Mounted Safety Apparatus*, January 4, 1994, assigned to Besam AB, Landskrona, Sweden.

12. *Daily Safety Check* videotape for owners/caretakers of automatic pedestrian doors prepared by the American Association of Automatic Door Manufacturers (AAADM).

## DESCRIPTION OF THE ACCIDENT

On Saturday, September 1, 2001, Plaintiff Claudia Gonzalez was struck and seriously injured as she was attempting to exit through the inner set of bi-parting automatic sliding pedestrian doors at the Staples store that is the subject of this lawsuit. Plaintiff Gonzalez was preceded by a family that had just entered the store through the subject door. The subject door closed suddenly and without warning when Ms. Gonzalez entered the threshold area of the door, resulting in the injuries for which she has filed suit. Ms. Gonzalez was struck so forcefully that the doors "broke out," as they are designed to do when subject to sufficient force.

## DOOR EQUIPMENT

The subject automatic pedestrian door is a bi-parting sliding door manufactured by Dor-O-Matic,® Inc., 7350 West Wilson Avenue, Harwood Heights, IL 60706, an Ingersoll-Rand company, and is located on the interior side of a vestibule that provides ingress and egress from the Staples store. The subject door was installed some time in 1999, so that I am not certain if the 1991 or the 1999 version of the ANSI A156.10 national standard applies. Consequently, both will be considered in the following. See items 4 and 5 under *Evidence Considered.*

The subject door is actuated on approach from either side by what appears to be a BEA, Inc. "Eagle™" K-band (24 GHz) microwave motion sensor (one such sensor per side). These sensors may have been OEM'd to Dor-O-Matic, Inc. from BEA, Inc., and may, therefore, carry the Dor-O-Matic brand name, rather than BEA, Inc. They are mounted in the traditional location at the center of the vertical surface on each side of the door header, and are aimed generally downward and away from the door.

Presence detection in the vicinity of, but not within, the door closing path is provide by dual infrared (IR) hold open beams extending across the door opening between the facing edges of the fixed side panels at two discrete heights above the floor. No other sensors were provided on the subject door and, in particular, no presence detection device was provided within any part of the door closing path itself.

The sliding door panels are fully exposed throughout their entire range of motion, and retract to positions on the interior side of the adjacent fixed panels. Consequently, and of particular relevance to this case, the sliding panels were closer to Plaintiff Gonzalez, in the direction of her travel out of the store, than the fixed panels carrying the hold open beams.

## INTENDED OPERATION OF THE DOOR

The intended operation of the subject sliding door at the time of the accident involving Plaintiff Claudia Gonzalez on September 1, 2001, was that it be initially triggered to open automatically on detection of the motion of an approaching pedestrian by one or the other of the K-band microwave motion sensors mounted on the door header. In the case of Ms. Gonzalez' attempt to exit from the Staples store, it was the microwave motion sensor mounted on the interior (store side) of the door header that was to provide this function.

Upon opening in response to the motion detection signal, two hold open beams mounted on the facing edges of the fixed door panels and spanning the space between them were intended to detect the presence of the door user within the door closing path and to prevent the door from closing for as long as the user remained within the door closing path.

A so-called hold open time delay appended to the loss of the motion and presence detection signals is intended to allow the user adequate time to clear the doorway before the beginning of the door closing sequence.

## CAUSE OF THE ACCIDENT

### A.  Primary cause

The proximate cause of the accident involving Plaintiff Claudia Gonzalez on September 1, 2001, was the failure of the combination of the approach-side microwave motion sensor, the hold open beams and the hold open time delay to keep the subject door open long enough for Ms. Gonzalez to clear the door opening without being struck. Even if properly maintained and adjusted, the sensors on the subject door at the time of the accident involving Ms. Gonzalez stood in violation of both the 1991 and 1999 versions of the ANSI A156.10 national standard, and also exhibited certain obvious inherent shortcomings that readily account for the accident.

**Hold open beams –** The hold open beams deployed on the subject door are *not* mounted within the door closing path. Rather, they are mounted between the two fixed side panels which, in the direction Ms. Gonzalez was walking, were on the *further* side of the sliding panels. Thus, Ms. Gonzalez was able to get into the door closing path *before* reaching the hold open beams which, if occluded, would have prevented the door from closing on her.[1]

---

[1] This assumes, of course, that the hold open beams were in proper working order at the time of the accident.

Second, the hold open beams provide protection at only two discrete heights above the floor, whereas the door closing path extends continuously from the floor all the way to the top of the door panels. Consequently, it is readily possible for a portion of a user's body to be within the door closing path while failing to occlude either of the hold open beams, allowing the door to close on the user and clearly violating §5.2.2 of the ANSI A156.10-1991 national standard and §8.2.2 of the ANSI A156.10-1999 national standard. See also *Violations of 1991 and 1999 ANSI A156.10 national standards*, on page 9 below.

**Microwave motion sensors** – Microwave motion sensors of the type deployed on the subject door operate on the Doppler principle. They incorporate no "intelligence" permitting them to distinguish the motion of human "targets" from the motion of the door itself. Consequently, they suffer from two obvious serious deficiencies in this application.

First, the Doppler shift upon which such motion sensors depend goes to zero in the area immediately in front of the door opening for horizontal motion. Second, they must be aimed generally away from the door to prevent detection of, and triggering on, the motion of the door itself. As a consequence, the motion detection beam edge falls also immediately in front of the door opening. The beam "edge" is the point at which the signal strength from the motion sensor falls so low that motion detection becomes unreliable and fails, independent of the adequacy of the Doppler shift. Morever, the pedestrian about to move into the door closing path is, unfortunately, then moving away from the motion detection beam rather than into the "core" of the beam where detection reliability is more robust.

As a consequence of these two factors, motion detection may be lost just in front of the door opening, especially if the user is moving slowly and smoothly horizontally.[2] Also, it is characteristic of the internal design of such sensors that, once motion detection is lost, it is much more difficult to re-trigger motion detection than to sustain it. If motion detection is lost immediately in front of the door opening, it may be impossible to re-trigger detection *no matter how fast* the user moves horizontally into the door closing path.

Thus, if motion detection is lost immediately in front of the door opening, the user may be able to move into the door closing path without re-triggering the motion detection signal. Upon expiration of the hold open time delay, the door is free to close on the user unless the door closing path is protected by a reliable presence sensing device. Unfortunately, the hold open beams deployed on the subject door at the time of the accident are unreliable and stand in violation of the 1991 and 1999 versions of the ANSI A156.10 national standard.

---

[2] The Doppler effect depends upon the component of motion toward or away from the sensor, not transverse to (around) the sensor. Consequently, immediately beneath the sensor – that is, immediately in front of the door opening – purely horizontal motion results in no Doppler shift. Only the up-and-down component of the gait produces Doppler shift immediately in front of the door opening.

**Hold open time delay** – Finally, had the hold open time delay been adequate, Ms. Gonzalez would have had time to clear the door closing path before the door began its closing sequence, even if motion detection had been lost and she failed to occlude either of the hold open beams.

## B.  Additional contributory causes

### 1.  *Failure to provide adequate warnings on the subject door*

An additional factor in the cause of the accident involving Ms. Gonzalez was failure adequately to warn of the hazard presented by the subject door.  See *Violations of ANSI Z535.4-1991 national standard* on page 9 below.

The photographic evidence of the door reveals that the subject door failed to carry warnings meeting the requirements of the ANSI Z535.4 national standard.  Had warnings conforming with ANSI Z535.4 been affixed to the door, Ms. Gonzalez might have used the door in a different manner, such as by obtaining the assistance of another individual as she went through the doorway, or by avoiding use of the subject door altogether, thereby preventing the accident that occurred on September 1, 2001.

Failure to provide such warnings, in violation of ANSI Z535.4, denied Ms. Gonzalez the opportunity to make such a decision, as well as the information she would have needed to make that decision.  Neither the warning, nor the requisite information, was made available to her.

### 2.  *Failure to perform Daily Safety Check*

Yet a further contributing factor to the cause of the accident involving Ms. Gonzalez on September 1, 2001, was the failure of the Defendant to perform the *Daily Safety Check* as recommended by the door manufacturer, all door service companies, and by the American Association of Automatic Door Manufacturers (AAADM).  See *Evidence Considered*, item 12 on page 2.

Indeed, it has been represented to me by Plaintiff's counsel that the Staples store manager has testified that the subject door was *never* inspected at any time, whether it be daily, weekly, monthly or other.  Moreover, the photographic evidence provided to me shows that the subject door does not carry a *Daily Safety Check* decal, either that available from the manufacturer, Dor-O-Matic, Inc., or from the American Association of Automatic Door Manufacturers (AAADM).  See also item 12 under *Evidence Considered*.

It is important that the *Daily Safety Check* should be performed properly on a daily basis because of the probabilistic nature of detecting the consequences of the limitations of its sensors as described under *Primary cause,* which begins on page 4. Normal day-to-day variations in the specific way that the *Daily Safety Check* is performed properly would have eventually revealed the problem caused by the inadequacy of the hold open beams, and the beam edge and minimal Doppler shift effects on motion sensor performance.

### 3. *Failure to upgrade to newer, more reliable sensors*

**Presence sensors –** Cost effective presence sensors utilizing reflected infrared (IR) technology have been available since the mid-1980's. Such sensors are superior to hold open beams because they provide coverage within the entire door closing path, as required to meet the performance mandated by the 1991 and the 1999 versions of the ANSI A156.10 national standard. Had such a sensor been added to the subject door and properly adjusted, the accident involving Ms. Gonzalez on September 1, 2001, would not have occurred.[3]

Another newer, more reliable presence sensor technology that could have been added to the subject door is the so-called "light curtain."[3] The light curtain is essentially a vastly improved version of the now obsolete hold open beam. However, instead of only one or two beams across the door opening, up to *several hundred* beams are utilized, with the result that it is virtually impossible for any part of the body to cross the light curtain into the door closing path without being detected. Light curtains are cost effective and are now deployed commonly in association with elevator doors.

### 4. *Failure to utilize older, more reliable technology*

The accident involving Ms. Gonzalez on September 1, 2001, would have been prevented if the subject door had been equipped with control (or switch) mats. Control mats are cost-effective, have been available for many decades, provide stable jamb-to-jamb presence detection, do not have to be disabled at any time during the operation of the door, are virtually immune to interference, suffer from no defects such as susceptibility to poor

---

[3] Note that the suggestion is that the reflected IR presence sensor be *added* to the door system, in addition to the hold open beams, rather than in place of the hold open beams, because of the well known principle that overall detection reliability is enhanced through the use of multiple, redundant sensors. The same argument holds for the suggestion of the light curtain.

infrared reflectivity or insufficient Doppler shift, and have been declared "The most reliable method for sensing the presence of a person known in the art."[4]

## 5.  *Failure to institute preventative maintenance*

Plaintiff's counsel has also represented to me that the subject door was service only on an "as needed" basis and was not under a program of preventative (or planned) maintenance at the time of the accident involving Ms. Gonzalez.[5]

My experience investigating over 130 automatic pedestrian door cases includes none in which preventative maintenance was in place at the time of the accident. It also reveals that automatic pedestrian doors of all types require frequent service, and seldom go more than a few months without service.

Proper preventative maintenance would also have increased the likelihood of upgrading to more modern and reliable sensors as discussed under headings 3 and 4 above.

## 6.  *Improper maintenance of the subject door*

Plaintiff's counsel has represented to me that the microwave motion sensor mounted on the exterior (vestibule) side of the subject door failed to detect rapid lateral motion in the area immediately in front of the door opening on the exterior side. This indicates that the exterior side motion sensor on the subject door is improperly aimed, that its sensitivity is improperly set, or that it is malfunctioning for some other reason. Consequently, it appears that the subject door has been poorly maintained, which could also have been a contributing factor to the accident on September 1, 2001. Such a condition would not obtain if the door were under a program of preventative maintenance.

---

[4] See page 1 of the specification sections of the five U.S. patents listed under items 7 through 11 under *Evidence Considered* on page 2.

[5] The interest of public safety demands that problems with automatic pedestrian doors be identified and repaired *before* they lead to an accident, and *not* after an accident has already occurred. Service on an "as needed" basis is akin to servicing commercial aircraft only after a crash has occurred, a clearly unacceptable policy.

## C.  Violations of ANSI Standards

### 1.  *Violations of 1991 and 1999 ANSI A156.10 national standards*

§5.2.2 of the ANSI A156.10-1991 national standard requires that

> "A presence sensor safety device shall be used to prevent (a) fully open door(s) from closing when a person is in the door closing path."

The subject door failed to comply with this provision of the ANSI standard because the *door closing path* contained no presence sensing safety device at all. The hold open beams used with the subject door are not located within any part of the door closing path. A door user, or a part of a door user, can readily be within the door closing path without being detected by the hold open beams.

Likewise, §8.2.2 of the ANSI A156.10-1999 national standard requires that

> "A presence sensor shall be used to prevent (a) fully open door(s) from closing when a person is in the space between two non overlapping activation detection areas."

Because hold open beams are not located within the door closing path and do not cover the entire span from the floor to the top of the door, it is readily possible for a person to be within the "space between two non overlapping activation [in this instance, microwave motion sensor] detection areas" and not occlude either beam. When this is so, the door will close on the person, in clear violation of §8.2.2 of ANSI A156.10-1999.

### 2.  *Violations of ANSI Z535.4-1991 national standard*

Section 2.1 of the ANSI Z535.4-1991 national standard states that:

> "A product safety sign or label should alert persons to a specific hazard, the degree or level of hazard seriousness, the probable consequence of involvement with the hazard, and how the hazard can be avoided."

The warnings affixed to the subject door failed to comply with this provision of the ANSI Z535.4-1991 national standard.

## CONCLUSIONS/OPINIONS

Based on my analysis of the cited evidence, my training and background, and in consideration of the foregoing discussion, it is my opinion to a reasonable degree of engineering and scientific certainty that:

1. The proximate cause of the accident involving Plaintiff Claudia Gonzalez on September 1, 2001, was the failure of the combination of the approach-side microwave motion sensor, the hold open beams and the hold open time delay to keep the subject door open long enough for Ms. Gonzalez to clear the door opening without being struck.

2. Because the closing path of the subject door was unprotected by a presence sensing device, the subject door was dangerous and unsafe and constituted a significant public hazard, and stood in violation of the 1991 and 1999 versions of the ANSI A156.10 national standard.

3. The subject door, as configured on September 1, 2001, stood in violation of section 5.2.2 of the ANSI A156.10-1991 national standard.

4. The subject door, as configured on September 1, 2001, stood in violation of section 8.2.2 of the ANSI A156.10-1999 national standard.

5. The subject door, as configured on August 23, 2000, stood in violation of section 2.1 of the ANSI Z535.4-1991 national standard.

6. The Defendant failed in its duty to provide a door that was safe for all anticipated users such as Claudia Gonzalez.

7. The Defendant failed to provide proper maintenance for the subject door, thereby rendering it dangerous and unsafe.

8. The Defendant failed properly to perform the *Daily Safety Check* on the subject door.

9. By failing properly to perform the *Daily Safety Check*, the Defendant failed to maintain the subject door in a safe condition for all invitees into its facility.

10. The Defendant failed to affix to the subject door signs and warnings complying with the ANSI Z535.4-1991 national standard.

11. The ANSI Z535.4-1991 national standard defines both the form and content of the warning labels that should have been provided on, or near, the subject door.

12. Warnings conforming with the requirements of ANSI Z535.4-1991 should have been affixed to, or near, the subject door informing door users of the hazard presented by the subject door, and how the hazard could be avoided.

13. On September 1, 2001, the subject door stood in violation of the ANSI Z535.4-1991 national standard in that it failed to provide warnings that "alert persons to a specific hazard, the degree or level of hazard seriousness, the probable consequence of involvement with the hazard, and how the hazard can be avoided."

14. The photographic evidence reveals that warning labels conforming with the requirements of ANSI Z535.4-1991 were not affixed to, or near, the subject door at the time of the accident.

15. The accident involving Ms. Gonzalez could have been avoided if warning labels conforming with the requirements of ANSI Z535.4-1991 had been affixed to, or near, the subject door on September 1, 2001.

Warren F. Davis, Ph.D.